# United States Court of Appeals
## For the First Circuit

No. 99-1842

UNITED STATES OF AMERICA,

Appellee,

v.

SANJAY SAXENA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Chief Judge,

Selya, Circuit Judge,

and Casellas,* District Judge.

Cheryl J. Sturm for appellant.
Victor A. Wild, Assistant United States Attorney, with whom
Donald K. Stern, United States Attorney, was on brief, for
appellee.

October 3, 2000

**SELYA, <u>Circuit Judge</u>.** Defendant-appellant Sanjay Saxena serves up a salmagundi of alleged errors. The main ingredient is his contention that the government reneged on obligations that it undertook in a plea agreement. Other morsels include the district court's failure specifically to inform him of the consequences of his guilty plea and its alleged missteps in the course of sentencing. Although the appellant's bill of fare contains some food for thought, close perlustration shows that it lacks any real substance. Accordingly, we affirm the judgment below.

## I. BACKGROUND

The appellant, a software engineer by training, immersed himself in the investment advisory business in 1992. At that time, he founded a business, called Vital Information, which published newsletters (e.g., "The Weekly Wealth Letter") offering financial advice to would-be investors. Representing that the insights contained in the newsletters derived from a computerized system designed to forecast the optimal times at which to buy and sell specific securities, the appellant held out hopes of huge profits. As the newsletters' readership increased, the appellant used them as a platform from which to market investment contracts — actually, syndicated partnership

interests — aimed at exploiting the computer program that he had developed.

Despite his lack of a verifiable track record, the appellant managed to lure a coterie of customers. Eventually, his activities attracted the attention of the Securities and Exchange Commission (SEC). After investigating the circumstances, the SEC filed a civil complaint accusing the appellant of selling unregistered securities. The appellant settled the civil case by pledging, inter alia, to make full restitution to disappointed subscribers. He fulfilled this promise, but a federal grand jury nonetheless indicted him for selling unregistered securities, 15 U.S.C. § 77e(a), prohibited transactions by a registered investment adviser, id. § 80b-6(1) & (2), mail fraud, 18 U.S.C. § 1341, false and fraudulent claims, id. § 287, and money laundering, id. § 1957.

After some procedural skirmishing, not relevant here, the appellant entered into a nonbinding plea agreement. See Fed. R. Crim. P. 11(e)(1)(B). In it, the appellant agreed to plead guilty to seventeen counts of selling unregistered securities, five counts of engaging in prohibited transactions, nine counts of mail fraud, and one count of making false and fraudulent claims. In exchange, the government promised to drop the other charges and to recommend a 24-month prison term and a

4

fine. The 24-month target was based upon a prediction that the district court would fix the guideline sentencing range (GSR) at 24-30 months (adjusted offense level 17; criminal history category I). The parties recognized that this prediction's accuracy depended on a three-level reduction for acceptance of responsibility, see USSG §3E1.1, and the government agreed to recommend that the court grant that reduction.

The district court conducted a change-of-plea hearing on March 23, 1999. Once the appellant had confessed his guilt, the court dismissed the extraneous counts and continued the matter for preparation of a presentence investigation report (PSI Report) by the probation department. In the meantime, the appellant remained free on bail.

During the interval when the PSI Report was in process, the SEC informed the United States Attorney's office that the appellant was soliciting subscriptions for a newsletter on the Internet and assuring potential investors that the insights contained therein would guide them to astronomical profits. As was true of the appellant's earlier venture, the main selling point for the new periodical involved a computer-driven timing formula. The solicitations sought one-year subscriptions, notwithstanding the appellant's knowledge that his immurement would begin within a few months, and did so through a web site

5

that included the appellant's picture and his "personal guarantee."

The Assistant United States Attorney (AUSA) who was handling the case believed that he had a duty to bring this information to the attention of the probation department, and he did so. The probation officer incorporated the information into the PSI Report and refused to recommend a downward adjustment for acceptance of responsibility.

The district court convened the disposition hearing on June 28, 1999. The AUSA continued to stand by the plea agreement, advocating an acceptance-of-responsibility credit. He did, however, respond to the court's specific inquiry by describing the appellant's new venture (as he understood it). Ultimately, the court decided not to award any credit for acceptance of responsibility and fixed the GSR at 33 to 41 months (adjusted offense level 20; criminal history category I).

Despite this development, the AUSA continued to recommend a 24-month term of incarceration. The court spurned this recommendation, instead imposing a 33-month sentence. The court also ordered a three-year term of supervised release, a $100,000 fine, the usual special assessment, and payment of restitution in the sum of $13,616 (related mostly to

unemployment benefits illegitimately collected by the appellant while running Vital Information).  This appeal ensued.

## II.  ANALYSIS

The appellant's assignments of error can be distilled into four categories.  We deal separately with each of them.

### A.  **Repudiation of the Plea Agreement.**

The mainstay of this appeal is the appellant's charge that the prosecutor functionally repudiated the plea agreement by informing the probation officer of his post-plea activities, and made a bad situation worse by uttering pointed remarks about those activities to the court.  Since this claim was not aired before the sentencing court, the appellant faces a formidable standard of appellate review.  When a defendant has knowledge of conduct ostensibly amounting to a breach of a plea agreement, yet does not bring that breach to the attention of the sentencing court, we review only for plain error.  See Johnson v. United States, 520 U.S. 461, 466 (1997); United States v. Olano, 507 U.S. 725, 731-32 (1993); see also Fed. R. Crim. P. 52(b).  Establishing plain error requires a quadripartite showing:  that there was error; that it was plain; that the error affected the defendant's substantial rights; and that the error adversely impacted the fairness, integrity, or public repute of judicial proceedings.  See Johnson, 520 U.S. at 467;

7

<u>Olano</u>, 507 U.S. at 732.  We sometimes have treated this last prong as a miscarriage-of-justice standard.  <u>See</u> <u>e.g.</u>, <u>United States</u> v. <u>Alicea</u>, 205 F.3d 480, 484 (1st Cir. 2000).

With the standard of review in place, we turn to the facts.  The appellant asserts that the government, though arguably adhering to the letter of the plea agreement (it did, after all, recommend both an adjustment for acceptance of responsibility and the agreed sentence) contravened the spirit of the agreement when it presented information regarding the appellant's post-plea activities to the district court.[1]  This assertion raises potentially difficult questions concerning how best to reconcile competing centrifugal and centripetal forces: the prosecution's solemn duty to uphold forthrightly its end of any bargain that it makes in a plea agreement, <u>see</u> <u>Santobello</u> v. <u>New York</u>, 404 U.S. 257, 262 (1971), and its equally solemn duty to disclose information material to the court's sentencing determinations, <u>see</u> <u>United States</u>  v. <u>Hogan</u>, 862 F.2d 386, 389 (1st Cir. 1988).  While these responsibilities admittedly can tug in different directions, we conclude that the government here kept the balance steady and true.

_____

[1]Since the probation officer functions as an arm of the court, <u>see</u> <u>United States</u> v. <u>Charmer Indus., Inc.</u>, 711 F.2d 1164, 1170 (2d Cir. 1983), we treat the AUSA's disclosure of information to the probation officer as the functional equivalent of disclosure to the court.

The mere furnishing of the information gives us little pause. By statute, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. In view of the clear language of this statute, the sentencing judge "has a right to expect that the prosecutor and the probation department, at the least, [will] give him all relevant facts within their ken . . . ." Hogan, 862 F.2d at 389. In a nutshell, the government has an unswerving duty to bring all facts relevant to sentencing to the judge's attention. See United States v. Mata-Grullon, 887 F.2d 23, 24 (1st Cir. 1989) (per curiam); United States v. Voccola, 600 F. Supp. 1534, 1538 (D.R.I. 1985).

The information gleaned from the SEC was plainly within the compass of this duty. That information bore an easily discernible relationship to the offense conduct and, viewed objectively, cast doubt on the sincerity of the appellant's professions of remorse. Thus, the government, having learned the facts, was obliged to disclose them. See, e.g., Hogan, 862 F.2d at 389; Voccola, 600 F. Supp. at 1538-39.

The AUSA's handling of the information at the time of sentencing presents a somewhat different question. A defendant

9

who has entered into a plea agreement with the government, and himself fulfills that agreement, is entitled to the benefit of his bargain.  See Santobello, 404 U.S. at 262 (explaining that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled").  Satisfying this obligation requires more than lip service on a prosecutor's part.  The Santobello rule "proscribe[s] not only explicit repudiation of the government's assurances, but must in the interests of fairness be read to forbid end-runs around them."  Voccola, 600 F. Supp. at 1537.

There are, however, limits to what a defendant reasonably may expect.  See, e.g., United States v. Benchimol, 471 U.S. 453, 455-56 (1985); United States v. Ramos, 810 F.2d 308, 313 (1st Cir. 1987).  The government's obligation to furnish relevant information to the sentencing court does not vanish merely because the government has a corollary obligation to honor commitments made under a plea agreement.  These two obligations coexist — and prosecutors must manage them so as to give substance to both.

Of course, this sort of legal funambulism requires careful balancing.  The prosecutor must remain aware of the possibility of conflict.  He must discharge both duties

10

conscientiously.  And he may not attempt to use one duty as an instrument for thwarting the other.

It is against this backdrop that we analyze the appellant's charge that the prosecutor here played fast and loose.  The record reveals that, after listening to an extended discourse by defense counsel regarding the post-plea subscription scheme, the court asked the AUSA if he had anything to say in rebuttal.  The AUSA responded:

> The government is bound by its plea agreement and will honor its plea agreement as it should.  The information that the Court is referring to here, of course, is post-plea agreement matters [sic] and not known to the government previously.
>
> I would comment in this way in response to what you've just been told by counsel, that the defendant submitted some information to some investors.  The fact of the matter is that the information that I received from the SEC was found on the Internet and available virtually to the entire financial community and potential investors, it wasn't some minor matter as I understand it.  And it was more than just you can earn some money, it had huge figures on it.  And in many ways, your Honor, I submit that it mirrors the past activity because it has this deadline of application and so forth. I'm sure the Court has read the material itself, the last portion of it is "My Guarantee by Sanjay Saxena."  So it's not just the timing of it that concerned the government enough to have provided the material to probation, to the probation department, but also the substantive nature of it that concerns us.

11

> At this time, your Honor, the government does not know how much money the defendant may have obtained by this solicitation, or if there is any money under management by the defendant as a result, and I think only the Court can make that inquiry, the government was not in a position to do so.

The judge eventually decided that the appellant had not demonstrated an entitlement to a downward adjustment for acceptance of responsibility. He subsequently asked the prosecutor for a specific sentencing recommendation. The prosecutor replied:

> The government's recommendation in this case is pursuant to our plea agreement. And I'm well aware, your Honor, of the fact that my recommendation is below what the Court has determined the guidelines applicable to be. Nonetheless, bound by that agreement the government does recommend a sentence of 24 months which, of course, was based on the calculations [of] the parties . . . .

Surveying the record in its entirety, we are persuaded that the AUSA's commentary, though not a model of circumspection, did not transgress the plea agreement. We consider it important that the AUSA's remarks came at the court's urging and in direct response to defense counsel's attempt to put an innocent gloss on the post-plea activities. In context, the comments appear reasonably calculated to furnish the court the information that it needed to place those activities in perspective.

12

We also deem it noteworthy that the AUSA approached the matter cautiously. He interspersed his statements with disclaimers about the sketchiness of the available information and the limited extent of the government's knowledge. Perhaps most important, he resolutely stood by the bottom-line recommendation that the government had committed to make, urging a 24-month sentence even after the court had indicated that it would not award an acceptance-of-responsibility adjustment.

Despite these countervailing factors, the appellant lobbies for a contrary conclusion. His argument places great weight on two cases in which this court held that the government breached plea agreements. Neither decision assists his cause.

In United States v. Clark, 55 F.3d 9 (1st Cir. 1995), the government's sentencing memorandum, after acknowledging that the plea agreement's terms obligated the government not to oppose an adjustment for acceptance of responsibility, went on to state that such largesse would be inappropriate based on post-plea activities undertaken by the defendant. See id. at 12. Because the second statement effectively nullified the government's feeble attempt to meet its original commitment, we found that the government had breached the plea agreement. See id. That is a far cry from the case at hand, in which the

13

prosecutor reported the newly-discovered facts to the court, but nevertheless stuck by the government's agreed recommendations.

The appellant's second case, United States v. Canada, 960 F.2d 263 (1st Cir. 1992), is even more readily distinguishable. There, we held that the prosecutor violated a plea agreement because she "failed affirmatively to recommend 36 months, as promised, and she went on to emphasize [the defendant's] supervisory role in the offense and then to urge the judge to impose 'a lengthy period of incarceration' and to send 'a very strong message.' " Id. at 269. Here, unlike in Canada, the government at no point suggested — or even insinuated — that the circumstances called for a different sentence than the one it had agreed to recommend.

We will not paint the lily. Weighing, on the one hand, the nature of the information relayed by the SEC and its potential relevance to the sentencing determinations that the judge was about to make, and, on the other hand, the prosecutor's comments and the context in which they arose, we hold that the government adequately balanced its promise-keeping and disclosure obligations. See Mata-Grullon, 887 F.2d at 24-25 (holding that the government did not attempt an impermissible end-run around a plea agreement promise when the prosecutor made the agreed recommendation, but accurately informed the court of

the purity and danger of the drugs involved in the offense of conviction).  Thus, we discern no error — plain or otherwise — in the handling of the disposition hearing.


### B.  The Plea Colloquy.

The appellant next complains that the sentencing court violated Federal Rule of Criminal Procedure 11(e)(2) by failing to inform him, at the change-of-plea hearing, that he would not be able to withdraw his guilty plea if the court decided to forgo the recommended 24-month sentence.  While we accept the basic premise of this complaint, we find the court's deviation to have been harmless.  Accordingly, we deny relief.  See Fed. R. Crim. P. 11(h) (stipulating that "[a]ny variance from the procedures required by [Rule 11] which does not affect substantial rights shall be disregarded").

Where, as here, the government and the defendant have entered into a nonbinding plea agreement that embodies a recommended sentence, Rule 11(e)(2) requires the court to "advise the defendant that if the court does not accept the recommendation . . . the defendant nevertheless has no right to withdraw the plea."  The court below omitted this advice.  The question, then, is whether that oversight constitutes reversible

15

error. That question must be asked despite the appellant's failure to seek withdrawal of his plea in the district court. See United States v. Santo, ___ F.3d ___, ___ (1st Cir. 2000) [No. 99-1899, slip op. at 9-10]; United States v. McDonald, 121 F.3d 7, 10 (1st Cir. 1997).

We asked a similar question in United States v. Noriega-Millán, 110 F.3d 162 (1st Cir. 1997), another case in which the trial judge neglected to comply with the letter of Rule 11(e)(2). We undertook a harmless-error analysis[2] and proceeded to study whether the bevue had adversely affected the defendant's substantial rights. See id. at 166-67. In the course of that exercise, we emphasized that "Rule 11's core concerns are absence of coercion, understanding of the charges, and knowledge of the consequences of the guilty plea," and found that, under the circumstances of the case, the trial court's omission had not endangered these concerns. Id. at 167. We based this finding on a combination of facts, including (1) the court's admonition to the defendant that it did not have to

---

[2]We left open the question whether harmless error or plain error — a measure less favorable to the defendant — constituted the correct standard of review. See Noriega-Millán, 110 F.3d at 166 n.4. The case at bar arises in a similar posture, but our recent decision in United States v. Gandia-Maysonet, ___ F.3d ___, ___ (1st Cir. 2000) [No. 98-1141, slip op. at 9-11], clearly indicates that the appellant's claim must survive plain-error review.

16

indulge the agreed sentencing recommendation, and (2) language in the plea agreement that specifically warned the defendant that he would not be allowed to retract his plea. See id. at 164, 167. Accordingly, we regarded the error as harmless. See id. at 168.

We believe that this case and Noriega-Millán are birds of a feather. Here, as there, the court made statements at the change-of-plea hearing that put the defendant on plain notice that it was not bound by the plea agreement. Indeed, the court below, at a later stage of the hearing, reinforced this message by telling the appellant quite pointedly that once he pleaded guilty, there was "no taking it back . . . no starting over." While this statement's temporal separation from the earlier statements defeats the government's argument that the combination coalesced to meet the formal requirement of Rule 11(e)(2), it nonetheless is relevant to our inquiry.

Moreover, as in Noriega-Millán, the written plea agreement in this case speaks loudly. Paragraph nine is entitled "Court Not Bound By Agreement." As the caption indicates, the provision spells out that the court is not wed to the government's sentencing recommendations. It then states:

> Defendant may not withdraw his plea of guilty regardless of what sentence is imposed. Nor may Defendant withdraw his plea because the U.S. Probation Office or

17

> the sentencing judge declines to follow the
> Sentencing Guidelines calculations or
> recommendations of the parties.

The appellant signed the plea agreement, acknowledging at the time that he had read it and understood its contents. This acknowledgment cannot be brushed aside as mere boilerplate: Chief Judge Young questioned the appellant intensively at the change-of-plea hearing, and the appellant stated unequivocally that he had read the agreement completely, that he had discussed it "multiple times" with his attorney, and that he fully comprehended it.

That ends this aspect of the matter. The court's admonitions, the appellant's statements, and the contents of the plea agreement combined to put the appellant on ample notice of the consequences of his plea. Armed with such knowledge, the appellant's decision to change his plea was unlikely to have been better informed by a more precise presentation of the applicable ground rules. In other words, had the court told the appellant explicitly that he would not be allowed to retract his plea if the court rejected the recommended sentence, the sum total of the appellant's knowledge would not have been increased and his willingness to plead would, in all probability, have

been unaffected.[3]  The court's error was therefore both harmless,

see Noriega-Millán, 110 F.3d at 167, and not plain.

## C.  **Acceptance of Responsibility.**

The appellant also assails the lower court's refusal to reduce his offense level for acceptance of responsibility. His principal line of attack focuses on the lack of specific subsidiary findings.  He is waging a losing battle.

The sentencing guidelines prescribe that a defendant's offense level should be trimmed by two levels, and sometimes three, if he accepts responsibility for the offense of conviction.  See USSG §3E1.1.  But a defendant is not entitled to this adjustment as an inevitable concomitant of a guilty plea.  See USSG §3E1.1, cmt. (n.3).  Rather, he must demonstrate that he has taken full responsibility for his actions, and he must do so candidly and with genuine contrition.  See United States v. Ocasio-Rivera, 991 F.2d 1, 4 (1st Cir. 1993); United States v. Royer, 895 F.2d 28, 30 (1st Cir. 1990).  Moreover, "[t]he defendant has the burden of proving his entitlement to an acceptance-of-responsibility credit, and the sentencing court's determination to withhold the reduction will be overturned only

------

[3]We note that the appellant couches his argument in terms of per se reversible error, carefully refraining from any claim that the court's omission actually misled him.  As previously mentioned, that argument is foreclosed in this circuit.  See Noriega-Millán, 110 F.3d at 166-67.

if it is clearly erroneous."  Ocasio-Rivera, 991 F.2d at 4 (internal citations omitted).

In this case, the appellant's post-plea activities — the occurrence of which is not disputed — did not involve the sale of unregistered securities per se.  But by continuing to couch offers of investment advice in pie-in-the-sky hyperbole, under circumstances that easily could gull potential subscribers into thinking that the appellant's hand would be on the tiller throughout the subscription period, the appellant displayed a high degree of insensitivity to the root causes of his original problem.  By the same token, these actions plainly revealed a lack of understanding of the basic fallacy inherent in the scheme that had put him in the dock.  Thus, the court could well have thought that, by pleading guilty, the appellant had intended to acknowledge only that the technical requirements of the securities laws had caused his venture to founder, and that his subsequent actions showed a predilection to continue sailing much too close to the wind.

In the last analysis, actions often speak louder than words.  Cf. Royer, 895 F.2d at 30 (emphasizing that "merely mouthing empty platitudes should not entitle an offender" to a downward adjustment under USSG §3E1.1).  Because the appellant's post-plea activities reasonably could be construed as exhibiting

20

conduct inconsistent with a full and ungrudging acceptance of responsibility, the district court's ruling had a solid foundation. See, e.g., United States v. Carrington, 96 F.3d 1, 9-10 (1st Cir. 1996); United States v. O'Neil, 936 F.2d 599, 600-01 (1st Cir. 1991). No more is exigible. See Royer, 895 F.2d at 30 (approving the denial of an acceptance-of-responsibility credit when "the court had a plausible basis for arriving at the conclusion").

The appellant seems to recognize this reality, and spends most of his time arguing that the court made inadequate findings on the subject. We have not heretofore imposed a requirement that a sentencing court accompany a denial of a downward reduction for acceptance of responsibility with elaborate factfinding, and we decline today to place such a burden upon the district courts. We are particularly reluctant to do so when, as now, the reason for declining to grant the adjustment — the appellant's course of conduct during the interval between the change-of-plea hearing and the disposition hearing — is readily apparent. We believe that such an approach is in line with preferred practice. See United States v. Blas, 947 F.2d 1320, 1330 (7th Cir. 1991).

The appellant's criticism of the lack of findings has another dimension. He charges that the sentencing court

neglected its obligations under Federal Rule of Criminal Procedure 32(c)(1). The rule reads in pertinent part:

> For each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing.

This effort is misguided. What the appellant advertises as factual disputes are nothing of the kind. As we illustrate below, the facts germane to acceptance of responsibility are not in controversy.

The appellant claims that a factbound dispute exists based on the text of paragraph 45 of the PSI Report. This paragraph states in substance that the appellant's solicitation of one-year subscriptions to his newsletter does not comport with acceptance of responsibility, given the near-certain prospect of his incarceration during that period. The appellant rails that this is inaccurate because the newsletter possibly could be run by others in his absence. This is not an argument over the facts, but an argument over the persuasiveness of the conclusion reached in the PSI Report (and subsequently adopted by the district court). The appellant's attempt to contest the PSI Report's assertion that the newsletter was fraudulent suffers from the same infirmity; it is the significance of the activities, not the activities themselves, that are in question.

22

The short of it is that the disagreements concerning the appellant's post-plea activities center not on factual discrepancies, but, rather, on the opinions of the probation officer and the conclusions drawn by the sentencing court from the undisputed facts. Rule 32(c)(1) imposes an obligation upon the court to resolve contested <u>facts</u> that are material to a sentencing decision, but that obligation does not extend to opinions and conclusions. <u>See</u> <u>United States</u> v. <u>Cureton</u>, 89 F.3d 469, 474 (7th Cir. 1996); <u>United States</u> v. <u>Osorio</u>, 929 F.2d 753, 764 n.5 (1st Cir. 1991). Hence, Rule 32(c)(1) is inapposite to the acceptance-of-responsibility issue.

## D. **The Fine**.

Finally, the appellant alleges that the court below erred in failing to make specific findings of fact when it fined the appellant. This argument deserves short shrift.

The appellant's thesis consists of two parts. First, he renews his reliance on Rule 32(c)(1) and suggests that the court failed to resolve disputed issues of fact before imposing the $100,000 fine. This suggestion overlooks that Chief Judge Young, after hearing argument from both sides, expressly adopted the findings and conclusions contained in the PSI Report. Thus, "[t]he only logically inferable conclusion is that the court rejected each and all of appellant's fact-based challenges to

23

the PSI Report." United States v. Savoie, 985 F.2d 612, 621 (1st Cir. 1993).

The second half of the appellant's thesis posits that the sentencing court failed to consider the factors required by 18 U.S.C. § 3572(a), which provides that the court, in determining the incidence and amount of a fine, shall consider, inter alia, the defendant's income and financial resources; the burden placed on the defendant and his dependents; the pecuniary loss, net of restitution, suffered by others as a result of the defendant's actions; and the need to deprive the defendant of ill-gotten gains. See United States v. Merric, 166 F.3d 406, 408 (1st Cir. 1999) (discussing statutory purport). The statute, however, does not require a sentencing court to follow a rigid format, utter magic words, or employ a mechanical formula. As long as the court gives consideration to the factors discussed in section 3572(a), the statute is satisfied. See id.; see also Savoie, 985 F.2d at 620.

In this case, the court complied sufficiently with section 3572(a). In scrutinizing the record, we start with a presumption of correctness — a presumption that, as long as the sentencing court was presented with adequate record evidence, it will be deemed to have considered the statutory criteria. See Merric, 166 F.3d at 408; United States v. Wilfred Am. Educ.

24

<u>Corp.</u>, 953 F.2d 717, 719-20 (1st Cir. 1992). The record here reveals no sound basis for dispelling this presumption.

The relevant section of the PSI Report, which the court explicitly adopted, contained all the necessary information concerning the appellant's financial condition, the likely impact of a fine on his family, and the details of the restitution that he already had made. In addition, defense counsel provided the court with abundant information concerning factors adversely affecting the appellant's ability to pay. Finally, although the GSR provided for a fine of between $7,500 and $7,000,000, the court opted to set the amount near the low end of this range. We view this as some additional evidence that the court paid attention to the required factors and did not simply pull a punitive figure out of thin air. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Peppe</u>, 80 F.3d 19, 22-23 (1st Cir. 1996). Taking all of this into account we hold, without serious question, that the district court complied adequately with section 3572(a). <u>See</u> <u>Merric</u>, 166 F.3d at 408 ("Where the pertinent information is presented in the district court, this court will assume that the district court considered it.").

## III. CONCLUSION

We need go no further. To the extent that the appellant raises other points, they are insufficiently

25

developed, obviously incorrect, or both.  The short of it is that the appellant was lawfully sentenced.

**Affirmed.**