# United States Court of Appeals
## For the First Circuit

Nos. 17-1965
     17-1966

UNITED STATES OF AMERICA,

Appellee,

v.

CARMELO ESTEBAN VELÁZQUEZ-APONTE,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Torruella, Lipez, and Thompson,
Circuit Judges.

Laura Maldonado-Rodríguez, for appellant.
Julia M. Meconiates, Assistant United States Attorney, with
whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and
Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief,
Appellate Division, were on brief, for appellee.

October 11, 2019

**TORRUELLA**, **Circuit Judge**. In June 2011, Defendant-Appellant Carmelo E. Velázquez-Aponte ("Velázquez") went on a three-day carjacking spree. After six years of litigation, Velázquez was ultimately convicted of eleven offenses arising from the spree, including four counts of carjacking -- one of which resulted in the death of a person -- four counts of possessing a firearm in furtherance of those carjackings, two counts of possessing a stolen firearm, and one count of possessing a firearm as a convicted felon. Velázquez now appeals his convictions on various grounds. After careful review, we affirm.

## I.   Background[1]

**A.   Factual Background**

**1.   First Carjacking: Mieses's Ford Pickup Truck**

On June 18, 2011, Velázquez shot and killed Richardson Mieses-Pimentel ("Mieses") at a Shell Gas Station in the municipality of Carolina, Puerto Rico, after which he took Mieses's gun and fled in Mieses's black Ford Explorer pickup truck. The next day, Officer Cynthia Rodríguez-Birriel ("Officer Rodríguez") went to the scene and viewed the gas station's security footage. Officer Rodríguez recognized the assailant in the video as

---

[1]  We summarize the relevant facts, reserving for our analysis a more detailed discussion of the facts relevant to each issue presented on appeal.

Velázquez, whom she knew because she had previously investigated him regarding state criminal charges.

## 2. Second Carjacking: Collazo's Mitsubishi Outlander

On June 19, 2011, while officers were investigating the first carjacking, Velázquez arrived at another Shell Gas Station, this time in the area of Villa Prades in the municipality of San Juan. There, he spotted Jan Carlos Collazo ("Collazo") in the driver's seat of a "wine-colored Outlander" SUV while a friend was outside drying off the SUV's exterior.[2] Velázquez approached the vehicle and placed a black pistol on the back of Collazo's head while ordering him to step out. After taking Collazo's Samsung cellphone, Velázquez ordered Collazo to get back in and start the car. During this exchange, another friend of Collazo's, Zaimarie Font-Zayas ("Font"), approached the SUV unaware of the situation. After Collazo successfully started the car, Velázquez ordered him to get out once again. Before leaving the station with Collazo's vehicle and cellphone, Velázquez pointed his gun at Font and threatened to kill her if she said anything.

## 3. Shootout with Officers Rivera and León

The following day, June 20, 2011, Officer Daniel Joel Rivera-Martínez ("Officer Rivera") was patrolling the area of the

---

[2] Witnesses used "wine-colored," "burgundy," and "red" to refer to the same stolen Mitsubishi Outlander.

Plaza Carolina shopping mall when a man told him that his nephew's "red Outlander" had been stolen. Officer Rivera misunderstood that the man's nephew had taken off with the Outlander. In a bizarre coincidence, an Outlander of that color drove by the two men seconds later, prompting Officer Rivera to signal the vehicle to stop. Believing he was about to encounter the man's nephew, Officer Rivera exited his patrol car and, while pointing his service firearm, instructed the Outlander's driver to get out of the vehicle. It turned out it was Velázquez driving Collazo's vehicle. From the driver's seat, Velázquez stuck his right arm out of the SUV and shot at Officer Rivera. Velázquez then exited the vehicle and, while shooting, ran towards Officer Rivera, who returned fire before losing consciousness due to bullet wounds. Once Officer Rivera regained consciousness, he noticed that his service revolver was missing.

After hearing over the radio that a fellow officer had been injured at the Plaza Carolina shopping mall, Officer Edwin León-Jiménez ("Officer León") saw a Mitsubishi Outlander matching the description of the suspect vehicle announced over the radio pass him by, heading in the opposite direction. Officer León, who was on a motorcycle, followed Velázquez into a residential development where Velázquez stopped the SUV and began shooting at

him.  Officer León returned fire while he took cover behind his motorcycle.

### 4.  Third Carjacking: Officer Fargas's Patrol Car

Officer Edgardo Fargas-Pérez ("Officer Fargas") arrived as backup in his patrol car, within which he had a navy-blue cap that said "POLICIA."  As both officers took cover behind the patrol car, they noticed children playing outside in a nearby summer camp. The officers retreated from the patrol car and sought cover behind a truck to avoid Velázquez, who was walking toward them and shooting "without any care for [their] life or for his."  Suddenly, the shots stopped and Officer Fargas saw Velázquez board the patrol car and flee the scene.

### 5.  Fourth Carjacking: Gómez's White SUV

Velázquez then drove to a nearby Total Gas Station in Carolina where Johnny Gómez-Castro ("Gómez") was fixing the tire of his daughter's SUV, a white Mercury Mountaineer.  Gómez testified that while he was opening the door to the SUV, a man ordered him to hand over the keys.  Simultaneously, Gómez felt something "like metal" pressed against his left side.  After that, Gómez heard the man say "[h]urry up, because I just injured a police officer."  The man then took the car keys, ripped a gold chain bearing a cross pendant from Gómez's neck, and drove away in the Mountaineer.

### 6. Velázquez's Arrest

Responding to radio reports, Officer Joel Caldero-Ríos ("Officer Caldero") saw a Mercury Mountaineer and followed it on his motorcycle into a residential area. Cornered, on a dead-end street, Velázquez exited the vehicle with two firearms and began shooting at Officer Caldero, who returned fire but lost sight of Velázquez. Arriving soon afterwards, Officer Maribel Medina-Matos pursued Velázquez on foot and ultimately arrested him with the help of other officers. Officers recovered Collazo's cellphone from Velázquez's bag, along with Mieses's gun and Officer Rivera's firearm from Velázquez's person. Inside the Mercury Mountaineer, they found Officer Fargas's cap with the word "POLICIA" written on it and a gold chain.

## B. Procedural Background

### 1. Indictment

On July 6, 2011, a grand jury indicted Velázquez with eleven counts related to the crime spree.[3] Although the case was

---

[3] Count 1 charged Velázquez with a carjacking that resulted in the death of a person, in violation of 18 U.S.C. § 2119(3). Counts 3, 5, and 7 charged Velázquez with carjacking in violation of 18 U.S.C. § 2119. Count 2 charged Velázquez with possessing and using a firearm in furtherance of the carjacking set forth in Count 1 of the Indictment, and in the process causing the death by murder of a person with the firearm in violation of 18 U.S.C. § 924(c) and 924(j)(1). Counts 4, 6, and 8 charged Velázquez with possession of a firearm in furtherance of the carjackings set forth in Counts 3, 5, and 7, respectively, in violation of 18 U.S.C. § 924(c). Count 9 charged Velázquez with being a felon in possession of a

death penalty eligible, on April 24, 2014, the government informed the court that it would not seek the death penalty.[4]

On December 9, 2014, defense counsel asked the court to transfer Velázquez to the Federal Medical Center ("FMC") in Butner, North Carolina, for a competency evaluation. The next day, the district court granted the request and ordered Velázquez's transfer for a forensic psychiatric or psychological examination to determine his competency to stand trial.[5]

## 2. **Forensic Mental Health Evaluation Report**

On November 20, 2015, the Warden of FMC Devens transmitted to the district court a comprehensive Forensic Mental Health Evaluation Report rendered by a board-certified forensic psychologist of that institution, finding that Velázquez was competent to stand trial and sane at the time of the offenses ("Forensic Report").[6] The Forensic Report described Velázquez's

---

firearm in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2). Finally, Counts 10 and 11 charged Velázquez with possession of a stolen firearm in violation of 18 U.S.C. § 922(j) and § 924(a)(2).

[4] On February 18, 2014, the court had "expressed its concerns regarding the extensive length of time that the DOJ ha[d] taken" in determining whether to seek the death penalty.

[5] The evaluation was ultimately conducted at the Federal Medical Center Devens ("FMC Devens") in Ayer, Massachusetts.

[6] The Forensic Report, dated November 9, 2015, actually consisted of two parts, the first addressing Velázquez's competency to stand trial, and the second, captioned "Forensic Report Addendum,"

-7-

complex mental health history. According to the Forensic Report, the first available record of Velázquez's mental health problems consisted of a note from his "primary care physician at Clínica Borinquen in August 2007, indicating 'anxiety disorder' and a prescription for the anxiolytic/benzodiazepine medication alprazolam."

The Forensic Report further documented that while under the custody of the Puerto Rico Department of Corrections for an unrelated weapons offense, from March 2008 until his release in June 2011, Velázquez was intermittently prescribed a variety of drugs: Alprazolam (anxiety), Zyprexa (antipsychotic), Depakote (mood stabilizer), Paxil (antidepressant), and Elavil (antidepressant). During this time, Velázquez was initially diagnosed only with Antisocial Personality Disorder. After he described his history of psychiatric treatment, a diagnosis of schizophrenia was added.

The Forensic Report next recounted that once in federal custody and prior to his competency evaluation,[7] Velázquez injured himself on several occasions and was prescribed various

---

opining on the defendant's sanity at the time of the offenses.

[7] According to the Forensic Report, Velázquez was released from the Bayamón Correctional Institution for "Weapons Law Violations" on June 14, 2011 and arrested for the federal offenses related to this appeal on June 20, 2011.

medications based on his requests and self-reported symptoms, including Prozac (antidepressant), Zyprexa (antipsychotic), Risperdal (antipsychotic), Seroquel (antipsychotic), Klonopin (anxiety), Remeron (antidepressant), Wellbutrin (antidepressant), and Buspar (anxiety).  At the time the report was written, November 9, 2015, Velázquez had been prescribed and was taking Wellbutrin, Buspar, Klonopin, Seroquel, and Remeron.

The Forensic Report stressed that Velázquez's "mental health history [was] primarily based on his own self-report, as opposed to actual clinical observation of serious mental health symptoms."  As an example, it noted that Velázquez's initial schizophrenia diagnosis in 2008 was "[b]ased only on [Velázquez's] self-report."  The Forensic Report further noted that over time, Velázquez had described "a more severe history of mental health problems and treatment than is clinically documented." Additionally, it observed that Velázquez's reported mental health history "ha[d] often been inconsistent," and that Velázquez "ha[d] reported a number of atypical and unusual symptoms which are rare among genuinely mentally ill individuals."

The Forensic Report concluded that Velázquez "d[id] not meet [the] criteria for Schizophrenia or any other Psychotic Disorder."  It determined that Velázquez did have a longstanding

personality disorder,[8] identifying it as Antisocial Personality Disorder with Borderline Features ("APD"). According to the Forensic Report, the "essential feature of [APD] is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15."

As to Velázquez's competency to stand trial, the Forensic Report concluded that Velázquez did not "suffer from a mental illness which would render him mentally incompetent to the extent he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." The Forensic Report acknowledged that Velázquez could be "very difficult to work with," or could "refuse to work with his attorney" altogether, but stressed that "this is volitional behavior which is not motivated by a mental illness. The defendant is capable of working with his attorney and assisting in his defense if he chooses to do so."

### 3. Evidentiary Hearing

On April 18, 2016, the district court held an evidentiary hearing. The court interacted with Velázquez throughout the hearing and described him as "very articulate, very cool, very

_____

[8] According to the Forensic Report, "[a] personality disorder is an enduring pattern of experience and behavior that is pervasive and inflexible and leads to distress or impairment."

reflective, with excellent language and excellent expression."
After considering Velázquez's demeanor and noting that the medical
evaluations and forensic reports "clearly indicate that
[Velázquez] has a capacity to both understand the trial and aid
[his attorney] in understanding, in helping [Velázquez] to defend
himself," the district court ruled that the case would proceed to
trial.

During the afternoon session of the evidentiary hearing,
Velázquez's counsel expressed concern that Velázquez had not been
receiving certain medications since his return to Puerto Rico from
the mainland and that the dosage of one of his medications had
been substantially decreased.  Moreover, Velázquez's counsel
explained that working with Velázquez was not easy, as he was at
times uncooperative.  Thus, he reiterated a request that a second
attorney be appointed to assist in Velázquez's defense, which the
district court granted.

The next day, the district court issued an order to show
cause to the warden of the Metropolitan Detention Center ("MDC")
Guaynabo (the "Warden") as to why Velázquez "had not been receiving
the medications or appropriate dosage of the medications
prescribed."[9]  The issue of Velázquez's medication did not arise
again until months later, on the eve of trial.

_____

[9]  The record on appeal is silent as to any response from MDC

-11-

### 4. Severance of Count 9

At the request of the defense, the court severed Count 9, which charged Velázquez with being a felon in possession of a firearm. Thus, the case first proceeded to trial as to Counts 1-8, and 10-11.

### 5. Velázquez's Medication and Mental State During the First Trial

The topic of Velázquez's medication arose frequently during Velázquez's first trial. On June 27, 2016, the day before opening statements, defense counsel stated that Velázquez had informed him that he was not being provided his medications. The district court indicated that it would once again speak to the Warden. It acknowledged that it believed Velázquez's treatment was "apparently working" and that "[t]hose pills are winners. And I wouldn't want to take the winners out of the scheme until the trial is over."

On the first day of trial, June 28, 2016, the court placed on the record its conversation with the Warden. It explained that the Warden had informed it that Velázquez's medication dosage would not be decreased, and that "on advice" of Velázquez's psychiatrist in Florida, "the levels of the medicine

_____

Guaynabo and as to how this was resolved.

-12-

will be -- as to the principal medicine . . . the levels [administered] on Friday."

On day three of trial, June 30, 2016, defense counsel advised the court that Velázquez again complained he was not receiving the proper "dosage of the drug." In response, the court stated it would contact the Warden and request that Velázquez's doctor appear at court with Velázquez's medical record the following morning. The court sought Velázquez's permission to "talk to the doctor as to the exact medicines that [were] being provided to him." The defendant responded "Yes, you may. You can speak to the doctor."

The following morning, Dr. López -- the Medical Director of MDC Guaynabo -- met with the court, counsels of record, and the defendant. She reported, as the district court characterized it, that "all the medicines, including the medicines that [Velázquez] alleged he hasn't been receiving, he is receiving." On the record, Velázquez's counsel acknowledged that this statement was consistent with what Dr. López had said in the meeting, and did not challenge the statement. He added for the record that Dr. López had met with the defendant, alone, to discuss his treatment, and that because "trial, by definition, creates anxiety," Dr. López had indicated she would increase Velázquez's medication for anxiety.

Dr. López also took the stand and reiterated under oath that Velázquez was regularly receiving all of his medications. When asked to specify the medications, she indicated that the defendant was at the moment prescribed Venlafaxine (Effexor), Bupropion (Wellbutrin), and Clonazepam (Klonopin).[10] Dr. López explained that Velázquez was goal-oriented, organized in his thoughts, clear, and "most certainly d[id] understand what [was] going on." She also said that "in his goal-seeking . . . this is the type that always wants more and more and more. He will never be satisfied, and the object is control."

The parties discussed Velázquez's medications again on July 8, 2016, as Velázquez had apparently refused to take them. The court opened the record that day inquiring whether Velázquez was willing to take his medications. According to his counsel, Velázquez was participating in his defense, but was "not satisfied with the way that the medicines are being handled because he [was] used to . . . more medication." Nevertheless, the court arranged for the medication to be brought from MDC, and Velázquez took his medication later that day during a recess. The judge noted that

---

[10] There is no information in the record as to who prescribed those medications to Velázquez, or why three of those medications are different from the five medications -- Wellbutrin, Buspar, Klonopin, Seroquel, and Remeron -- he was prescribed at the time the Forensic Report was completed on November 9, 2015. The two medications that remained the same were Wellbutrin and Klonopin.

Velázquez "looked very calm to me. I appreciate his conduct. He seemed very cooperative with the Court."

## 6. First Trial Verdict

Once the government rested its case, Velázquez's counsel moved for a judgment of acquittal under Fed. R. Crim. P. 29 regarding "the events of the Mountaineer" (Counts 7 and 8). The court reserved judgment.

Next, Velázquez's counsel informed the court that the defense would not present evidence. As a result, the court advised Velázquez that he had a right to present witnesses and also to not take the stand, to which Velázquez responded that he understood. When the court asked Velázquez whether it was his decision to not present witnesses, however, he responded "I don't know what to answer." Trying to explain, the court asked Velázquez whether he had heard the court state at the beginning of trial that he is presumed innocent, to which Velázquez initially responded, "No," and then said, "Well, I remember when you told the jury." Afterwards, Velázquez said that he had asked his attorney to present an argument and that his counsel had responded that what he requested "was not evidence. It was argumentation." After Velázquez conferred with his attorneys, they informed the court that Velázquez would not take the stand or call any witnesses. Velázquez agreed.

Velázquez's counsel also informed the court that Velázquez was requesting to meet with him for two days before closing arguments, a request which the court partially granted.

Eventually, the jury found Velázquez guilty as to all counts.

### 7. Second Trial

The second trial concerned solely Count 9 for being a felon in possession of a firearm. Prior to commencing the second trial, the court held another hearing to discuss Velázquez's competency. Based on Velázquez's demeanor and interactions during the hearing, the court found Velázquez to be competent and alert, without any observed mental health problems that would prevent him from continuing to trial. In the end, the jury found Velázquez guilty.

## II. Discussion

On appeal, Velázquez asserts challenges to the proceedings during both his first and second trials. As to the first trial, Velázquez contends that 1) he was deprived of a fair trial because the trial court failed to sua sponte question the effects of medication on his competence; 2) the admission of certain DNA evidence violated the Confrontation Clause; and 3) the government failed to present sufficient evidence to prove Counts 7 and 8. As to the second trial, Velázquez claims that the district

court 1) failed to caution the jury against premature deliberations and 2) violated his rights under the Confrontation Clause by allowing Officer Rodríguez's testimony.

## A. Velázquez's Competency During the First Trial

Velázquez first argues that he is entitled to a new trial because the district court failed to question the effects of the psychiatric medications that he was taking on his competence during trial. Although Velázquez concedes that his "mental health, medication, evaluation and treatment were amply discussed throughout the six years of litigation," he claims that the district court did not continually monitor the "fluctuations" in his medications or the potential effects of the drug combinations. He notes that the medications given to him during trial differed from the medication prescribed while he was at FMC Devens.

Velázquez further contends that "[o]ther than being calm and well behaved, there are no other indications in the record that the fluctuations in medication were monitored by the district court." He suggests that "[p]erhaps [his] insistence in meeting with his lawyers for two days prior to the closing arguments" is evidence of his "misunderstanding [of] the proceedings."

Velázquez acknowledges that we review this unpreserved claim for plain error. See United States v. Llanos-Falero, 847 F.3d 29, 33-34 (1st Cir. 2017) (reviewing unpreserved claim that

-17-

district court failed to sufficiently inquire about medications during a change-of-plea hearing under the plain error standard). Under plain error review, the appellant bears the burden of showing "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Montañez-Quiñones, 911 F.3d 59, 63-64 (1st Cir. 2018) (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)). "This standard of review places a heavy burden on the defendant and 'tends to afford relief . . . only for "blockbuster" errors.'" United States v. Acevedo-Hernández, 898 F.3d 150, 167 (1st Cir. 2018) (quoting United States v. Moran, 393 F.3d 1, 13 (1st Cir. 2004)).

The government first argues that Velázquez waived this argument on appeal, as he did not develop it past a skeletal sketch and failed to argue the last two prongs of the plain error test. In the alternative, the government argues that the district court did not err, much less plainly err. It asserts that Velázquez did not provide any case law supporting the proposition that the district court had to further inquire, sua sponte, about the effects of Velázquez's medications during trial. Moreover, it stresses that the district court took "great pains" to ensure Velázquez received the proper treatment and was competent to stand

trial, highlighting the different instances throughout the litigation when the court inquired and/or received information regarding Velázquez's mental state. Finally, the government stresses that Velázquez's behavior during trial supports the conclusion that he was competent, and that in any case, the district court's appraisal of a defendant's demeanor should be afforded deference.

It is well settled that the conviction of a person who is legally incompetent to stand trial violates due process. United States v. Brown, 669 F.3d 10, 17 (1st Cir. 2012); see Pate v. Robinson, 383 U.S. 375, 378 (1966). "The test for competency [to stand trial] is whether the defendant first has sufficient present ability to consult with counsel with a reasonable degree of rational understanding, and second [whether he] has a rational and factual understanding of the proceedings against him." Brown, 669 F.3d at 17; see United States v. Ahrendt, 560 F.3d 69, 74 (1st Cir. 2009) (citing Dusky v. United States, 362 U.S. 402, 402 (1960)). "The 'understanding' required is of the essentials -- for example, the charges, basic procedure, possible defenses -- but not of legal sophistication." Robidoux v. O'Brien, 643 F.3d 334, 339 (1st Cir. 2011).

After careful consideration of the record and the arguments, we find that Velázquez's claim fails. Velázquez argues

in general terms that the court failed to appreciate or monitor the way in which his prescription drugs affected him throughout the trial. However, except for one instance in which he claims he was confused and which we will discuss further below, he does not specify any behavior that should have prompted the judge's concern, or explain why the court's inaction constituted plain error. Thus, his "failure to elaborate clearly how [the] purported lapse[s] by the district court meet[] the four-part test for plain error risks waiver." Llanos-Falero, 847 F.3d at 35.

Regardless, even if not waived, and even if the court had erred -- issues we are not deciding -- Velázquez failed to show that any error was clear or obvious, and thus we need not reach the remaining two plain-error prongs.

Indeed, contrary to Velázquez's allegations, the court took measures to assess his competence and to ensure he received proper treatment. First, the court requested and received a mental competency evaluation that concluded Velázquez was competent to stand trial and capable of working with his attorney and assisting in his defense if he chose to do so. Second, the court held an evidentiary hearing prior to trial to discuss the findings of the competency report, during which it had the opportunity to interact with the defendant, and ultimately concluded that Velázquez had the capacity to understand the trial

and aid his attorneys in his defense. Moreover, throughout trial, the court was attentive to Velázquez's demeanor and to his complaints that he was not receiving proper medication. On several occasions, both before and during trial, the court inquired with the Warden and/or MDC Guaynabo's Medical Director about Velázquez's medications, and each time, they confirmed that he was receiving appropriate doses.[11] Moreover, Dr. López, MDC Guaynabo's Medical Director, spoke with Velázquez outside the presence of the judge and later testified that Velázquez was "very goal-oriented," "organized in thoughts," and "clear." Upon the district judge's inquiries regarding whether Velázquez understood "what's going on here," Dr. López responded: "He most certainly does understand what's going on. And, as I said, he's goal-oriented."[12]

Most importantly, Velázquez has not pointed to anything

---

[11] As to Velázquez's earlier complaints during the evidentiary hearing held months before trial that he was not receiving adequate doses of the medications, the district court issued an order to show cause to the Warden of MDC Guaynabo, but the record is silent as to any response.

[12] Dr. López explained that "goal-oriented" meant that Velázquez sought control. She stated:

> [P]art of the personality traits here are wanting to control small things, such as, for example, where do I sit? It's also going to escalate. You can anticipate that in his goal-seeking, he's -- this is the type that always wants more and more and more. He will never be satisfied, and the object is control.

in the record that suggests reasonable cause to believe that he was incompetent during trial. Here, the district court had opinions from two medical professionals to the effect that Velázquez was competent, one rendered prior to trial (Forensic Report), and the other during trial (MDC Guaynabo Medical Director's testimony). See Ahrendt, 560 F.3d at 75 (noting that a qualified mental health professional's report is an important factor for the trial court to consider when determining competency). Moreover, the district court had the benefit of perceiving Velázquez's demeanor and behavior during the evidentiary hearing and a 13-day trial.[13] See United States v. Rodríguez-León, 402 F.3d 17, 25 n.8 (1st Cir. 2005) (refusing to "second guess" the district court's determinations as it had "the benefit of directly perceiving [defendant's] demeanor"). Additionally, Velázquez's lucid responses to the court,[14] his

---

[13] At the evidentiary hearing, the court noted that Velázquez was "very articulate, very cool, very reflective, with excellent language and excellent expression." On the eighth day of trial, the court observed that Velázquez "seemed very cooperative with the court." Even when the court was not describing its observations of Velázquez for the record, that does not mean it was not assessing his demeanor and behavior. See Sturgis v. Goldsmith, 796 F.2d 1103, 1109 (9th Cir. 1986)(explaining that a "defendant's demeanor and behavior in the courtroom can often be as probative on the issue of his competence as the testimony of expert witnesses").

[14] For example, on June 27, 2016, the day before trial commenced, when asked about a hypothetical plea offer, Velázquez responded "I want to go to trial." On June 30, 2016, when the court requested

counsel's acknowledgement on July 8, 2016 that he was participating in his defense,[15] and even his own monitoring of his medication regimen, all suggest that he was competent even if he was medicated.

The only instance that Velázquez points to in support of his claim of incompetence occurred at the close of the government's case in chief. Velázquez asserts that he was confused when the court inquired whether he agreed with his counsel's statement that the defense would not present evidence, and that "[p]erhaps, [his] insistence in meeting with his lawyers for two days prior to the closing arguments was the result of his misunderstanding the proceedings." As mentioned earlier, however, the defendant need not have a legally sophisticated understanding of the proceedings, and an initial confusion as to the difference between argumentation and evidence, coupled with a request to meet for two days prior to closing arguments, does not show that Velázquez lacked a reasonable degree of rational understanding of the proceedings or that he was

_____

that Velázquez allow it to speak with his doctors, Velázquez responded, "Yes, you may. You can speak to the doctor." At the close of the government's case, when the court asked him whether he remembered when it discussed his presumption of innocence, he responded, "Well, I remember when you told the jury."

[15] On July 8, 2016, the eighth day of trial, Velázquez's attorney noted that Velázquez had "been participating in the trial well with [him]."

unable to assist in his defense. See Robidoux, 643 F.3d at 339. To the contrary, it shows that Velázquez was an engaged and active participant. Furthermore, Velázquez has not pointed to anything in the record that backs his assertion that he could have been drowsy or dizzy to the point of incomprehension.

With this background, Velázquez's general assertion that the district court's inquiries regarding the effect of his medication were insufficient, without even the slightest factual support for the proposition that Velázquez was incompetent during trial, is far from sufficient to establish clear error.[16]

## B.  DNA Evidence

Velázquez next argues that forensic expert Joselyn Carlson's ("Carlson") testimony regarding the DNA evidence presented at trial violated his rights under the Confrontation

---

[16] The cases Velázquez cites are distinguishable and he makes no effort to explain why, considering the distinct facts of this case, they support his contention that it was clearly erroneous for the district court to have proceeded without further discussing the effects of his medication. Both Sell v. United States, 539 U.S. 166 (2003), and Riggins v. Nevada, 504 U.S. 127 (1992), involved the forced administration of drugs to a defendant, and United States v. Parra-Ibañez, 936 F.2d 588 (1st Cir. 1991), concerned a Rule 11 guilty plea hearing, during which the court had much less time to interact with the defendant than a full-throttle trial and the defendant was "simultaneously waiv[ing] several constitutional rights, including his privilege against compulsory self-incrimination, his right to trial by jury, and his right to confront his accusers," id. at 595 (quoting McCarthy v. United States, 394 U.S. 459, 466-67 (1969)).

Clause, as Carlson did not personally test any of the DNA samples on which her testimony was based.[17]  Velázquez stresses that Carlson was asked to "identify and match [DNA] samples, which she had not collected and tests she had not performed."  Without much explanation, he relies on Meléndez-Díaz v. Massachusetts, 557 U.S. 305 (2009).  Moreover, Velázquez summarily asserts that "the admission of the DNA evidence was crucial to the government's case" and therefore "[a] new trial should be ordered."

Because the government urges us to review this issue de novo, we apply the more defendant friendly standard here, even though the claim appears to not have been preserved.  Compare United States v. Díaz, 670 F.3d 332, 344 (1st Cir. 2012) (noting that "we consider de novo whether the strictures of the Confrontation Clause have been met" when such claim was preserved below (quoting United States v. Vega-Molina, 407 F.3d 511, 522 (1st Cir. 2005))), with United States v. Luciano, 414 F.3d 174, 177–78 (1st Cir. 2005) (reviewing for plain error an unpreserved Confrontation Clause claim).  "If a constitutional error has

---

[17]  Velázquez asserts this claim with regards to DNA evidence obtained from Exhibit 55, Mieses's black pistol, Exhibit 79, swabs taken from Mieses's Ford pickup truck (which Velázquez incorrectly describes as taken from the Mitsubishi Outlander), and Exhibit 80, the "POLICIA" cap.  While Velázquez avers that the government set forth DNA evidence linking him to Exhibit 9, Officer Rivera's service weapon, the transcript demonstrates that even though Rivera's firearm was tested, it did not yield a DNA profile.

occurred, we must order a new trial unless the government has shown that any error was 'harmless' beyond a reasonable doubt." United States v. Earle, 488 F.3d 537, 542 (1st Cir. 2007).

The government contends that Velázquez waived his Confrontation Clause claim on appeal due to lack of developed argumentation, and that regardless, Meléndez-Díaz is distinguishable from this case. Moreover, it references Williams v. Illinois, 567 U.S. 50 (2012), arguing that because Williams was a plurality opinion, its precise mandate and applicability to Velázquez's case is unclear. Alternatively, and most forcefully, the government asserts that any potential error in allowing Carlson to testify about the DNA profiles was harmless beyond a reasonable doubt, as the DNA evidence was cumulative, not conclusive.

We agree with the government's last point, and thus need not delve into the intricacies of the relationship between Carlson's DNA-related expert testimony and the Confrontation Clause. In this case, there is overwhelming evidence linking Velázquez to the crimes for which he was convicted. Except for Mieses, who was killed by Velázquez, and Gómez, all witnesses that were victims or responding officers identified Velázquez in open court. Moreover, Mieses's carjacking was caught on the Shell gas station security footage, from which Officer Rodríguez identified Velázquez. Furthermore, at the time of his arrest, officers

recovered Mieses's gun and Officer Rivera's service firearm from Velázquez's waistband, Collazo's cellphone from Velázquez's bag, and Officer Fargas's "POLICIA" cap and Gómez's gold chain from the Mercury Mountaineer. Additionally, Officer Fargas testified that he had his "POLICIA" cap in his patrol car when Velázquez took it, and Officer Caldero testified that he saw Velázquez get out of the Mercury Mountaineer at Villa Fontana, where Velázquez was later arrested. Finally, ballistic expert Erich Smith, an FBI forensic scientist and firearms and tool marks examiner, testified that Mieses's gun was used during the shootouts with Officers Rivera and León near the Plaza Carolina shopping mall, Officers León and Fargas near the summer camp, and Officer Caldero near Villa Fontana.

We need not go on. In the context of all the evidence presented at trial, it is clear that Carlson's testimony regarding the DNA evidence found on Mieses's firearm, his Ford pickup truck, and Fargas's hat was "at best cumulative of other compelling proof that [the defendant] committed the charged [crimes]." Earle, 488 F.3d at 546 (quoting United States v. Bartelho, 129 F.3d 663, 670 (1st Cir. 1997)). Thus, any error was harmless beyond a reasonable doubt.

## C. Sufficiency of the Evidence for Counts 7 and 8

Velázquez next argues that the government did not

present sufficient evidence to prove Count 7 charging him with carjacking the Mercury Mountaineer and Count 8 charging him with possessing a firearm in furtherance of that carjacking.

The elements of a carjacking offense under 18 U.S.C. § 2119(1) are the following: (1) the taking or attempted taking from the person or presence of another; (2) of a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce; (3) through the use of force, violence, or intimidation; (4) with the intent to cause death or serious bodily harm. United States v. García-Álvarez, 541 F.3d 8, 16 (1st Cir. 2008). The government bears the burden of proving all elements. Id. Additionally, Count 8 required the government to prove that Velázquez possessed a firearm in furtherance of a crime of violence, in this case, carjacking. 18 U.S.C. § 924(c)(1)(A).

Velázquez only asserts a lack of evidence regarding the first element of a carjacking offense, the taking of a motor vehicle. In support, he asserts four arguments: (1) that the victim, Gómez, did not identify him as the assailant; (2) that Gómez's initial testimony labeled the stolen SUV as a white Ford SUV, rather than a white Mercury Mountaineer; (3) that the government did not connect the stolen Mercury Mountaineer to Gómez, as there is no video from the gas station showing the taking or another witness's testimony to that effect; and finally, (4) that

-28-

Officer Fargas never testified his "POLICIA" cap was missing.

As to Count 8, Velázquez argues that Gómez only testified that he felt "something like metal" touching his side during the alleged carjacking rather than specifically seeing a weapon at the time of the taking. Velázquez insists that the item Gómez felt could have been any number of things, not necessarily a gun. Based on these points, Velázquez claims that the court should reverse the conviction on Counts 7 and 8 because no rational jury could have found the government proved each element beyond a reasonable doubt.

The government does not contest Velázquez's assertion that he preserved this challenge to the sufficiency of the evidence, so we review the court's Rule 29 determination de novo. See United States v. Díaz-Rosado, 857 F.3d 116, 120 (1st Cir. 2017). In doing so, "we examine the evidence, both direct and circumstantial, in the light most favorable to the prosecution and decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged count or crime." Id. (quoting United States v. Cruz-Díaz, 550 F.3d 169, 172 n.3 (1st Cir. 2008)).

Because Velázquez focused only on the first element required to prove a carjacking under 18 U.S.C. § 2119(1), we do so

here as well.  The government presented overwhelming evidence that Velázquez took the white Mercury Mountaineer from Gómez and that he possessed a firearm in furtherance of that carjacking. Velázquez is correct in that Gómez never identified his assailant nor the firearm used in the offense.  However, he ignores the plethora of circumstantial evidence linking him to the taking of Gómez's Mercury Mountaineer at gun point.

First, a rational jury could have found that Velázquez's actions during the carjacking, along with the evidence found on him at the moment of his arrest, show beyond a reasonable doubt that he took Gómez's vehicle while possessing a firearm.  Gómez testified that a man dressed in black approached him, placed a metal object on his side, told him to hurry up and give him the keys to the SUV because he had just injured a police officer, and ripped a gold chain from his neck before leaving with the vehicle. Because the jury heard evidence that Velázquez had shot and injured Officer Rivera earlier that day, Velázquez's own statements to Gómez support an inference that he was the one who took the Mercury Mountaineer.

Additionally, Officer Caldero testified that he saw Velázquez get out of the Mercury Mountaineer at Villa Fontana, where Velázquez was later arrested.  Officers found a "POLICIA" cap inside that Mercury Mountaineer, linking it to Velázquez's

carjacking of Officer Fargas's police cruiser, which Velázquez left near the Total gas station where the Mercury Mountaineer was carjacked. Officers also found Gómez's gold chain inside the Mountaineer, linking Velázquez to Gómez and the taking of his Mountaineer once again. Moreover, after the arrest, police found two stolen firearms in Velázquez's possession, allowing the jury to conclude that the metal object Gómez felt was a gun.

Furthermore, the government presented evidence that Velázquez carjacked two other people in a similar manner, including with threats and a firearm. The surveillance video from Mieses's carjacking shows Velázquez approached Mieses with a firearm and shot him prior to taking the car. As to the carjacking of Collazo's Mitsubishi Outlander, Collazo explained that Velázquez approached him from behind, held a weapon to the back of his head and threatened death if he did not comply. He saw the gun and was able to describe it. See United States v. Cruz-Rivera, 904 F.3d 63, 69 (1st Cir. 2018) (explaining that "[g]iven that the victims of the other two carjackings each also testified . . . that the defendant had used a gun in committing the carjackings that they endured, a jury could have inferred from the victims' testimony in combination that [the defendant] had access to multiple 'firearms' and had used one in committing each of these crimes"). Both Collazo and Font, his friend, testified that Velázquez was dressed

in black, just like the man that took Gómez's Mercury Mountaineer.

Finally, Gómez's initial identification of the stolen vehicle as a Ford SUV, juxtaposed to his later identification of the car as the Mercury Mountaineer in Exhibits 37 and 38, required a credibility determination from the jury. United States v. Lipscomb, 539 F.3d 32, 40 (1st Cir. 2008). Gómez was given a chance to clarify his statement and identify the correct car. When he did just that, a jury could have found him believable and their decision to do so should not be disturbed.

Considering all the evidence and the reasonable inferences derived therefrom in the light most favorable to the verdict, we conclude that a reasonable jury could have found beyond a reasonable doubt that Velázquez took the Mercury Mountaineer from Gómez while using a firearm, thus sufficiently establishing the challenged elements of Counts 7 and 8.

**D. Challenged Jury Instruction**

As to the second trial for the severed Count 9, Velázquez first contends that the court "failed to caution the jury against premature deliberations."

On March 6, 2017, after empaneling the jury for the second trial, the court provided preliminary instructions. As to premature deliberations, the court instructed:

> Until this case is submitted to you for your deliberations, you must not discuss this case with

-32-

anyone or remain within hearing of anyone discussing it. . . . After this case has been submitted to you for your deliberations, you must discuss this case only in the jury room when all of you are present.

At the end of the day, the court reiterated that the jury should "not discuss this case with anyone." Before a lunch recess on the second day of trial, the court stated: "Remember my instructions not to discuss it with anyone." And on the close of the third day of trial, after the government had rested its case, the court specified: "You have not heard yet the closing arguments nor the instructions of the [c]ourt, so you cannot talk to anybody or talk among yourselves about the case."

Velázquez concedes that the court did impart instructions warning the jury against premature deliberations, but asserts they were insufficient because the court failed to specifically tell the jurors "to refrain from discussing the case amongst themselves[] until after the end of the government's case in chief." Velázquez further admits that he did not object to the instructions below, so we should review his argument on appeal for plain error. See United States v. Henry, 848 F.3d 1, 13–14 (1st Cir. 2017) ("[T]he plain error hurdle, high in all events, nowhere looms larger than in the context of alleged instructional errors." (quoting United States v. Meadows, 571 F.3d 131, 145 (1st Cir. 2009))). Yet Velázquez does not fully develop his argument regarding the last two prongs of the plain error standard. As to

the third element -- that the alleged error affected his substantial rights -- Velázquez simply asserts that the district court's omission, in and of itself, should "amount to a showing of individual prejudice, not only because the instruction was not given but because the instruction should have been given in accordance to the Pattern Criminal Jury Instructions for the District Courts of the First Circuit."  Moreover, Velázquez's briefs are entirely silent as to the fourth prong of plain error review -- that any alleged error "seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Montañez-Quiñones, 911 F.3d at 63-64 (quoting Duarte, 246 F.3d at 60).

Thus, we need not decide whether the district court erred or whether the alleged error was clear or obvious because, even assuming that Velázquez meets the first two prongs, his challenge fails under the last two prongs of the plain error standard. First, while Velázquez argues that failing to use this circuit's pattern jury instruction should itself amount to a showing that his substantial rights were affected, our precedent discredits his argument.  We have noted that "although pattern instructions are 'often helpful,' their use is 'precatory, not mandatory.'"  United States v. Jadlowe, 628 F.3d 1, 17 n.29 (1st Cir. 2010) (quoting United States v. Urciuoli, 513 F.3d 290, 299 n.7 (1st Cir. 2008)

and United States v. Tse, 375 F.3d 148, 157 (1st Cir. 2004));
see also United States v. Gómez, 255 F.3d 31, 39 n.7 (1st Cir.
2001) (emphasizing district court's wide discretion in jury
instruction language). Moreover, to establish that his substantial
rights were affected, we have reiterated that Velázquez had to
show "a reasonable probability that, but for [the error claimed],
the result of the proceeding would have been different." United
States v. Turbides-Leonardo, 468 F.3d 34, 39 (1st Cir. 2006)
(quoting United States v. Padilla, 415 F.3d 211, 221 (1st Cir.
2005) (en banc)). Because Velázquez has not put forth any fact
or argument that would support such a finding, he has failed to
establish the third prong of plain error review.

In any event, Velázquez waived his claim of error by
failing to address the fourth prong of plain error review -- that
the alleged error seriously impaired the fairness of the judicial
proceedings. See United States v. Severino-Pacheco, 911 F.3d 14,
20 (1st Cir. 2018) (noting that "failure to attempt to meet the
four-part burden under plain error review constitutes waiver"
(relying on United States v. Pabón, 819 F.3d 26, 33-34 (1st Cir.
2016))).

**E. Officer Rodríguez's Testimony as to the Severed Count 9**

Velázquez's final claim of error is that Officer
Rodríguez's testimony in the second trial violated his rights under

the Confrontation Clause. To place this claim in context, we provide some background. Severed Count 9 charged Velázquez with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2). To prove this charge, the government had to establish that: (1) Velázquez was previously convicted of an offense punishable by more than one year in prison (meaning that he was a "felon"); (2) he knowingly possessed a firearm in or affecting interstate commerce, United States v. Wight, 968 F.2d 1393, 1397 (1st Cir. 1992); and (3) he knew he was a felon, Rehaif v. United States, 139 S. Ct. 2191, 2194 (2019).

As to the first element, the government submitted a certified copy of a prior Puerto Rico court judgment reflecting that Velázquez was convicted of a felony in state court.[18] This was a self-authenticating document pursuant to Rule 902(1)(A) of the Federal Rules of Evidence. The government read portions of it to the jury, including the caption, which specifically mentioned Carmelo Velázquez-Aponte, and a paragraph that stated, "Having considered the allegation, the Court finds the accused guilty of the crimes of Article 5.04, pneumatic weapon, and condemns him to punishment of two years in jail without costs." The government further noted that the document contained Velázquez's date and

---

[18] People of Puerto Rico v. Carmelo Velázquez-Aponte.

place of birth, sex, Social Security number, and address. In addition, Officer Rodríguez testified that the Carmelo Velázquez-Aponte named in the judgment was the Velázquez on trial.[19] Defense counsel objected to the testimony on the grounds of inadmissible hearsay, but the court overruled the objection because Officer Rodríguez had known Velázquez in the context of previous state court proceedings.

While Velázquez suggests another standard of review, we review for plain error because he did not object on Confrontation Clause grounds below, instead raising a hearsay objection. See Luciano, 414 F.3d at 178 (reviewing for plain error because defendant "did not raise this Confrontation Clause or Crawford-type claim in the proceedings below," rather the "defense objections were framed as hearsay and reliability objections").

Even if Velázquez had made some attempt at developed argumentation, and even if he had established the first two prongs of the plain error test, the third prong would be unsurmountable for him. As discussed earlier, Velázquez would have to show that his substantial rights were affected in that "but for [the error claimed], the result of the proceeding would have been different."

---

[19] The government explained that it was presenting this testimony because it did not "want [Velázquez] arguing in closing that it could be some other Carmelo Velázquez-Aponte."

Turbides-Leonardo, 468 F.3d at 39 (quoting Padilla, 415 F.3d at 221).  Yet here, the government established that Velázquez was a felon via a self-authenticating official state court document, which contained Velázquez's identifying information and which Velázquez did not challenge in any way.  Thus, there would have been no reason for the jury to second-guess the contents of an official state court conviction even absent Officer Rodríguez's testimony.  In the end, Velázquez's claim cannot prevail.

### III.  Conclusion

For the foregoing reasons, we affirm Velázquez's convictions.

**Affirmed.**