NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0294n.06

No. 19-3167

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

TONY O. CARTER, JR.,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

FILED
May 26, 2020
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
NORTHERN DISTRICT OF
OHIO

BEFORE: COLE, Chief Judge; and BOGGS and SUTTON, Circuit Judges.

BOGGS, Circuit Judge.  Tony Carter appeals his sentence, after conviction following a guilty plea on three drug-related charges, arguing that the prosecution breached its plea agreement at sentencing. Carter's plea agreement contained a miscalculation as to his base offense level under the United States Sentencing Guidelines. The error was corrected in the Probation Office's Presentence Investigation Report ("PSR"). At sentencing, the prosecutor, under "significant and direct inquiry" from the court below, admitted the mistake. The district court found that Carter was in any event a career offender and sentenced him on that basis.

Carter's plea agreement contained an appeal waiver. There is no indication that it was not knowing and voluntary, and he has not been able to show that this appeal falls under any of the enumerated exceptions to it. To be sure, we have precedents indicating that where a prosecutor materially breaches a plea bargain, a plea waiver contained therein is unenforceable. But that was not the case here. The prosecutor, in what courts have acknowledged is a tricky situation, did the

right thing in answering the court's inquiries. Moreover, the district court's decision that Carter was a career offender precludes any finding of plain error. We therefore affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

Tony Carter, Jr., was arrested on August 1, 2017 following a month-long investigation by the Elyria, Ohio Police Department and Lorain County Sheriff's Drug Task Force. Multiple confidential informants had conducted controlled buys from Carter, and when police searched his home pursuant to a warrant on August 1, they found cocaine, fentanyl, and fentanyl analogues (acrylfentanyl and carfentanil). Carter was arrested and given a *Miranda* warning. He confessed to police that the drugs were his.

Several months later, police learned that Carter was using a storage unit rented by his girlfriend to store drugs, and on November 20, 2017, they executed a search warrant on the storage unit, finding heroin, carfentanil, cocaine, and cash. Carter again confessed that the drugs were his.

Carter was indicted in the Northern District of Ohio on January 4, 2018 on thirteen drug-related counts. On September 24, 2018, the government filed an information under 21 U.S.C. § 851(a), stating that the government would rely on 21 U.S.C. § 841(b) to ask for an increased sentence in light of previous drug felonies. On September 27, Carter entered into a plea agreement with the government. This plea agreement provided for the dismissal of all but three counts and for a guilty plea as to those three. The agreement contained a "Stipulated Guideline Computation," which stated that, for each of the three remaining counts, "[t]he parties agree that the following calculation, using the current advisory Sentencing Guidelines Manual, represents the correct computation of the applicable offense level" and that the "Defendant and the USAO agree and stipulate that the amount of drugs" possessed with the intent to be distributed or conspired to be possessed with the intent to distribute in each count "corresponds to a base offense level of 24

pursuant to U.S.S.G. § 2Dl.l(c)(8)." At this level, under the maximum criminal history, Carter would face 77 to 96 months in prison.

Notwithstanding these stipulations, however, the parties further agreed that if the court found Carter to be a career offender, his guideline range would start at base offense level 37, with a criminal history of VI. No provision prevented the government from arguing for a career-offender enhancement. The agreement further stated that the parties had not reached any agreement on the sentence or range to be imposed, "other than to stipulate to the computation of the advisory Sentencing Guidelines offense level." It stated that any recommendations were not binding and that the "[c]ourt alone will decide the advisory guideline range . . . and what sentence to impose[.]" The government agreed to recommend a three-level reduction for acceptance of responsibility. There was no agreement as to the criminal history applicable in Carter's case, and Carter retained the right to argue that the career-offender designation should not apply. Finally, the plea deal contained an appellate-waiver provision, reserving the right to appeal only:

> (a) any punishment in excess of the statutory maximum; or (b) any sentence to the extent it exceeds the maximum of the sentencing imprisonment range determined under the advisory Sentencing Guidelines in accordance with the sentencing stipulations and computations in this agreement, using the Criminal History Category found applicable by the Court.

The plea bargain also protected his remedies for "claims of ineffective assistance of counsel or prosecutorial misconduct."

Pretrial Services filed the PSR on December 14, 2018. It determined Carter's adjusted offense level, based on "converted drug weight," to be 30. As the probation officer who prepared the PSR would later explain at Carter's sentencing, the figure in the original agreement, 24, had failed to take into consideration the rule under USSG § 2D1.1 that the weight of different drugs that are mixed together should be measured as though it was all the drug that carried the greatest

offense level (in this case, fentanyl analogue). The PSR contained a further two-level premises enhancement, based on the storage unit, thus bringing the offense level to 32. But then the PSR found that the career-offender enhancement applied, resetting the offense level to 34. This was 34 and not, as agreed in the plea bargain, 37, because the First Step Act had been passed subsequent to the signing of the plea bargain, which brought the maximum penalty down from life to forty years. Deducting three levels for acceptance of responsibility yielded a final offense level, per the report, of 31. The PSR indicated a criminal history category of VI. On January 4, 2019, the defense objected to the PSR's finding that Carter was a career criminal.

At the sentencing hearing on February 8, 2019, the district court noted the discrepancy between the base offense levels in the plea bargain and in the PSR. A lengthy colloquy between the government and the court followed. The government recommended that the court find the base level to be 24, but did not object to the 30 "because I think it's – I think they [the probation office] calculated that properly." The government argued that the question was in any case irrelevant, because the career-offender enhancement should apply, as was allowed by the plea and proposed by the PSR. The court replied that the question was nevertheless not just academic, because it would give each party an anchoring position from which to argue for variances. The court explained:

> Let me just tell you where it might come into play. In the event I do find him to be a career offender, I know that the defendant is, I believe, free to argue departures, variances -- I would anticipate that one of the arguments would be, without being a career offender, he would be at a 21 if you use the plea agreement. If you're a career offender -- if he's a career offender, 31, that's a ten-level span. I think I know Mr. Maloney [defense attorney] enough to know what the argument's going to be in terms of that's a big span, that's a huge leap in terms of the sentence. And, frankly, it's a bigger leap than whether -- or a bigger gap, whatever you want to call it, than if you start at the 30. You're talking a six-level difference. So I do -- I do believe that it's relevant whether the base offense level is a 24 or a 30, even though I agree

that at the end of the day, if he's a career offender, this is what the guideline range is.[1]

The government reiterated the career-offender point and that it was in any event standing by the "number 24." The court at this point interjected:

> THE COURT: So you don't think you missed something?
> MR. CORTS: We missed it.
> THE COURT: You weren't wrong when you came up with that 24?
> MR. CORTS: We were wrong. We didn't --
> THE COURT: Oh, you were?
> MR. CORTS: Yes. We didn't do the drug equivalency.
> THE COURT: Oh, okay. So you -- it wasn't a negotiated --
> MR. CORTS: No.
> THE COURT: You simply missed it?
> MR. CORTS: Well, at the end of the day, it's negotiated. That's what the guidelines were.
> THE COURT: You know what I'm saying.
> MR. CORTS: Yeah.
> THE COURT: The 24 was not a negotiated number, it was a number you folks believed to be true and accurate?
> MR. CORTS: Yes. That's what the Government believed.
> THE COURT: Then when you received Mr. Fabian's report, you're like, wait, we -- we made a mistake?
> MR. CORTS: Yes.
> THE COURT: Okay. That's what I needed to know.

The defense disagreed, arguing that "I'm not sure it was a mistake." The defense attorney did not outright argue that the number had been bargained for, but he suggested that he at least had been conscious that there were other ways of making the calculation and that, therefore, the court ought to give meaning to the figure at which the plea bargain had arrived. The prosecution countered that the calculation had been a simple mistake, recounting that there had been no "great dissertation or discourse about the conversion" during the plea negotiations. Nevertheless, the prosecution declared that "that's the negotiated plea, Judge. That's the way it is."

---

[1] [Not surprisingly (particularly given the judge's comments), defense later did make this exact argument.]

After hearing from the probation officer, who explained the underlying calculation, the court announced its thinking and conclusions:

> I have thoroughly reviewed this issue. You, Mr. Maloney [defense attorney], had pointed it out to me in your sentencing memorandum, so it certainly gave me the opportunity to prepare for it. I concluded before even coming out here today that it was simply an error. I didn't believe it was a negotiated number where you could argue both sides of the coin, and, therefore, you decided to negotiate it to a 24. So I am not going to change paragraph 37. It is going to remain at 30.

The court did, however, delete the premises enhancement, which had been subject to a similar discussion as to why it was not mentioned in the plea; the court held that in an abundance of caution, it would act as if it had been bargained away. Thus, the offense level remained at 30, not 32. Carter did not make an objection, at this point or at any previous point, to the government's statements regarding the base offense level.

The court then turned to the career-offender enhancement. After some discussion, it found that Carter was a career criminal. Carter lodged an objection—*his only objection*—to this finding. At that point, the court followed the calculations outlined in the PSR: starting at 34 (due to First Step), deducting three levels for the acceptance of responsibility, and arriving at a total offense level of 31.

There followed arguments for and against leniency, which mainly revolved, on the one hand, around the extensive length of Carter's criminal history, the deadliness of the drugs in the instant case, and the repeated drug-dealing in the instant case, and on the other, around the surprisingly minor previous sentences (18 months was his longest incarceration; 5 years the total), his acceptance of responsibility, and that Carter did not fit the typical "kingpin" profile for such a long sentence. The government noted that while it was "standing by" the calculation of the base offense level at 24, nevertheless "in the end, our calculations" also had classified Carter as a career criminal. "Government thought it was serious then, thinks it's serious now, thinks he's a career

offender now." The original deal and the discrepancies that had emerged with it are a theme the judge also returned to before imposing sentence:

> I also acknowledge that if I had taken the bargained-for levels, there would be a ten-level gap between base -- total offense level and career offender, taking the career offender into account, that offense level, that's a ten-level gap. Taking the numbers that I have concluded are appropriate, we are looking at a four-level gap. So, in other words, the defendant's guideline range has been increased by four levels because he's a career offender, and I acknowledge that his criminal history's already taken into account because he's in Criminal History Category VI.

Taking all in all, the court varied downward by two levels from the level 31 guideline range to level 29 and imposed an ultimate sentence of 151 months on each count, to be served concurrently.

## II.  STANDARD OF REVIEW

"We 'review[ ] the question of whether a defendant waived his right to appeal his sentence in a valid plea agreement de novo.'" *United States v. Pirosko*, 787 F.3d 358, 370 (6th Cir. 2015) (quoting *United States v. Smith*, 344 F.3d 479, 483 (6th Cir. 2003)) (brackets in original).

When a criminal defendant fails to object to the government's purported breach of a plea deal at sentencing, we review for plain error. *United States v. Barnes*, 278 F.3d 644, 646 (6th Cir. 2002); *see also United States v. Swanberg*, 370 F.3d 622, 627 (6th Cir. 2004). This standard has four parts:

> When reviewing a claim under a plain error standard, this Court may only reverse if it is found that (1) there is an error; (2) that is plain; (3) which affected the defendant's substantial rights; and (4) that seriously affected the fairness, integrity or public reputation of the judicial proceedings.

*Barnes*, 278 F.3d at 646. "Plain error may be committed by the government as well as by the district court." *Swanberg*, 370 F.3d at 627. "The phrase 'affects substantial rights' means 'in most cases . . . that the error must have been prejudicial: It must have affected the outcome of the district court proceedings.'" *United States v. Keller*, 665 F.3d 711, 714 (6th Cir. 2011) (quoting *United*

*States v. Olano*, 507 U.S. 725, 734 (1993)). Moreover, showing that it did so is the defendant's burden. *Id.* at 715.

### III.  ANALYSIS

#### A.  Carter's Appeal Waiver is Binding

Carter's plea bargain contains an acknowledgement of his "rights . . .  to appeal the conviction or sentence in this case, including the appeal right conferred by 18 U.S.C. § 3742" and states that he "expressly and voluntarily waives those rights." (This appeal is brought under 18 U.S.C. § 3742(a)(2) and 28 U.S.C. § 1291.) The exceptions in Carter's plea bargain are for:

> (a) any punishment in excess of the statutory maximum; or (b) any sentence to the extent it exceeds the maximum of the sentencing imprisonment range determined under the advisory Sentencing Guidelines in accordance with the sentencing stipulations and computations in this agreement, using the Criminal History Category found applicable by the Court.

The plea bargain also protects his remedies for "claims of ineffective assistance of counsel or prosecutorial misconduct."

This waiver precludes the current appeal. The statutory maximum at the time of the plea deal was life; it has since been reduced to forty years. Either way, the punishment of 151 months did not exceed it. Thus, the first waiver ground, (a), does not permit this appeal. Analyzing the second ground, (b), requires us to look to the "sentencing stipulations and computations" in the plea bargain and then ask if the sentence exceeds the maximum range under the guidelines for those figures. As we have seen, the court at sentencing did depart from the "stipulations" in the agreement in one respect, namely as to the base offense level. But an argument that this means that Carter can appeal under provision (b) is unavailing, because the PSR foresaw Carter being sentenced under up to an offense level of 37, with criminal history VI. Thus the sentence does not exceed the *maximum* sentence determinable under the "stipulations and computations" in his plea

agreement. *See United States v. Griffin*, 854 F.3d 911, 914–15 (6th Cir. 2017) (appeal foreclosed by waiver, notwithstanding the court's use of a higher offense level than stipulated, because the sentence imposed did not exceed the maximum sentencing range calculated in accord with the stipulations in the agreement).

Appeal waivers are deemed to be valid and binding unless they are not knowing or not voluntary. *Swanberg*, 370 F.3d at 625. We look to the plea colloquy and the written agreement to determine if the waiver was knowing and voluntary. *Id.* at 626. Carter's colloquy and plea bargain indicate that they were. More generally, there is no reason here to think that in our case, Carter's waiver was not knowing or voluntary. Carter's counsel does not argue the issue of waiver at all— not even on reply, after the government argued this point extensively in its brief.

For these reasons, we find Carter's plea waiver enforceable and applicable. However, there is another argument as to why it should not preclude this appeal.

### B. Plea Breach

If the government materially breached Carter's plea agreement, the waiver in it would be unenforceable. *See Swanberg*, 370 F.3d at 626–29; *see also United States v. Munoz*, 430 F. App'x 495, 498 (6th Cir. 2011). This, then, becomes the main argument in this appeal.

Analyzing the government's actions at Carter's sentencing hearing involves two lines of precedent that courts recognize as being in tension with one another. First, the government is held to exacting standards at a sentencing hearing. Ever since *Santobello v. New York*, it has been the rule that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." 404 U.S. 257, 262 (1971). Moreover, there is no "harmless error" exception to this rule: At the trial level in *Santobello*, the judge said explicitly that the prosecution's breach was inadvertent and

had had no impact on his sentencing decision, yet the Supreme Court held that reversal was required. *Id.* at 262–63; *see also Cohen v. United States*, 593 F.2d 766, 771–72 (6th Cir. 1979). "[T]he touchstone of *Santobello* is whether the prosecution met its commitment and not whether the court would have adopted the government's recommendation[.]" *Cohen*, 593 F.2d at 772. The test for violations is exacting. "Because a defendant obtains a plea agreement only at the expense of his constitutional rights, 'prosecutors are held to meticulous standards of performance.'" *United States v. Moncivais*, 492 F.3d 652, 662 (6th Cir. 2007) (quoting *United States v. Vaval*, 404 F.3d 144, 152-53 (2d Cir. 2005)). Thus, "[t]he *Santobello* rule 'proscribes not only explicit repudiation of the government's assurances, but must in the interests of fairness be read to forbid end-runs around them.'" *Moncivais*, 492 F.3d at 662. The remedy is resentencing before a different district judge. *See United States v. Fitch*, 282 F.3d 364, 368 (6th Cir. 2002).

On the other hand, prosecutors have a duty to tell the truth to courts and to respond to factual inquiries:

> [S]everal cases draw a[] . . . line between advocacy, on one hand, and providing the district court with relevant factual information, on the other hand. *See, e.g.*, *United States v. Munoz*, 408 F.3d 222, 227 (5th Cir. 2005) (noting that "[a]lthough the Government has a duty to provide the sentencing court with relevant factual information . . . it may not hide behind this duty to advocate a position that contradicts its promises in a plea agreement" and concluding that the government "crossed the line to breach by affirmatively advocating" (footnotes omitted)); [*United States v.*] *Saxena*, 229 F.3d [1,] 6 [(1st Cir. 2000)] ("The government's obligation to furnish relevant information to the sentencing court does not vanish merely because the government has a corollary obligation to honor commitments made under a plea agreement."); *United States v. Hand*, 913 F.2d 854, 856 (10th Cir.1990) ("A promise to 'recommend a reduction' is not a promise to stand mute in the face of incorrect or misleading testimony offered before the trial court."); *cf. United States v. Boatner*, 966 F.2d 1575, 1578 (11th Cir.1992) (noting that although "[t]he solemnization of a plea agreement does not preclude the government from disclosing pertinent information to the sentencing court," the government can "restrict the facts upon which the substantive offense is based").

*Moncivais*, 492 F.3d at 664 (second ellipsis in original). The cited cases are adamant: "In a nutshell, the government has an unswerving duty to bring all facts relevant to sentencing to the judge's attention." *United States v. Saxena*, 229 F.3d 1, 6 (1st Cir. 2000).

The courts have recognized the tension that this second set of duties creates with the first. *See, e.g.*, *ibid.* (describing the prosecutor's obligation to "give substance to both" "obligations" as "legal funambulism," i.e. tightrope-walking). That's the situation in which the prosecutor in our case found himself.

The prosecutor spoke only in response to questioning from a court that had already clearly identified the issue (the disparity between the base offense levels in the plea and the PSR) and had formulated a theory as to why (pure mistake). Indeed, Carter's counsel admits that the government provided its comments "upon significant and direct inquiry" by the district court. To be sure, the government did *stipulate* to a base offense level and that such level "represents the *correct* computation of the applicable offense level." But that does not mean that the prosecutor was free (much less that he was bound) to lie to the court when asked if the computation had been the result of purposeful bargaining or an inadvertent mistake. In other words, the court probed on this exact issue, and the prosecutor had a duty of candor to the court. He then advocated for the stipulated base offense level on the only grounds left, i.e. the bare fact that it had been stipulated in the plea agreement. Under these circumstances, we cannot say the government violated the plea agreement.

Moreover, we are reviewing for plain error, which simplifies the question. Even assuming that the prosecutors breached, and that the error in doing so was plain, it is hard to see how the error affected the defendant's substantial rights, as required by *Barnes*. 278 F.3d at 646. "The phrase 'affects substantial rights' means 'in most cases . . . that the error must have been prejudicial: It must have affected the outcome of the district court proceedings.'" *Keller*, 665 F.3d

11

at 714 (quoting *Olano*, 507 U.S. at 734) (ellipsis in original). Moreover, showing that it did so is the defendant's burden. *Id.* at 715. Carter's best argument in this regard is to point to the court's comments, at first hypothetical and directed to the prosecutor, then again at the imposition of sentence, indicating that the gap between the base offense level and the career-offender-enhanced level had some weight in its sentencing decision. But we see plainly that the district court had worked out what had happened on its own beforehand. It had also then decided (correctly) that Carter was a career offender. In other words, even assuming there was a breach, the breach did not lead to the judge's sentencing decision; the judge had seen the flaw in the calculations before the supposed breach. (Indeed, the supposed breach came about precisely because the judge saw the problem and inquired about it.) Thus we cannot say that the breach, even if there were one, "affected the defendant's substantial rights." *Barnes*, 278 F.3d at 646. For the same reason, this supposed breach would not "seriously affect[] the fairness, integrity or public reputation of the judicial proceedings." *Ibid*.

The government points, persuasively, to the case of *United States v. Keller*, in which the government committed a much more overt breach of the plea agreement by arguing at sentencing for a sentence dramatically above that in either the plea agreement or the PSR. 665 F.3d at 714. Nevertheless, we found no error, because the district judge sentenced the defendant based on the range recommended by the PSR (thus showing that he had not been influenced by the prosecution's argument) and because the sentence he ultimately received was lower than the upper end of that contemplated in the plea agreement. *Id.* at 715. So too, here, Carter received a sentence that was lower than the upper end of that contemplated in the plea agreement, because the plea agreement contemplated sentencing him based on a career-offender-enhanced basis of 37 points. As the *Keller* court put it:

> "The defendant whose plea agreement has been broken by the Government will not always be able to show prejudice, either because he obtained the benefits contemplated by the deal anyway (e.g., the sentence that the prosecutor promised to request) or because he likely would not have obtained those benefits in any event."

*Ibid.* (quoting *Puckett v. United States*, 556 U.S. 129, 141–42 (2009)). Carter's case fits into *both* of these categories: first, his sentence was consistent with the plea agreement, since the agreement contemplated the possibility of the career-offender enhancement being applied (indeed, the actual sentence was lower in the end, due to the passage of the First Step Act). And second, the benefit he seeks in this appeal—an argument at (re)sentencing from the prosecution in favor of a base level of 24—would not likely yield any practical benefit, since the error in the plea agreement's calculations is laid out in the PSR for any other judge to see.

To put it all together, we hold that there was a valid appeal waiver in Carter's plea agreement, which was entered into knowingly and voluntarily, and that this appeal does not fall under the enumerated exceptions to that waiver. While, if there had been a breach of that plea agreement, the plea waiver provision would be unenforceable, here there was no breach. And finally, if there had been a breach, the defendant cannot show plain error as required on review.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the sentence imposed by the district court.